REAVLEY, Circuit Judge,
dissenting:
There is no justification to remand for “a more reasoned explanation for why the non-jurisdictional utilities will participate in the binding cost allocation process, or why their lack of participation will not result in unjust and unreasonable rates.” The Majority errs by labelling Order No. 1000’s reciprocity condition a post hoc rationalization and errs more deeply still by failing to accord FERC’s policy decision appropriate deference.
FERC, Order No. 1000 includes the “reciprocity condition” that requires non-jurisdictional utilities to “participate in transmission planning and cost allocation in exchange for open access.” S. Carolina Pub. Serv. Auth. v. F.E.R.C., 762 F.3d 41, 92 (D.C. Cir. 2014) (citing Order No. 1000 ¶¶ 818-19, 76 Fed.Reg. at 49,961). “By conditioning non-public utilities’ access to the open systems of public utilities on the former’s adherence to the planning and cost allocation requirements, [Order No. 1000] encourages non-public utilities to participate in planning and cost allocation.” Id. at 93; see also id. at 94-95 (explaining that the reciprocity condition requires “both transmission planning and cost allocation” from “utilities that choose to seek Commission-jurisdictional transmission service”).
The court here disregards the reciprocity condition because only one mention is made in the Compliance Orders. However, in the Second Order on Rehearing, FERC reminds that “if a coordinating transmission owner does not accept the cost allocation, the transmission planning process removes the benefits of those coordinating transmission owners that do not accept the cost allocation” and cost allocation determinations therefore remain “commensurate with the estimated benefits considered.” Second Order on Rehearing at ¶ 57. In any event, the reciprocity condition is a rule found within Order No. 1000 and cannot be written off as a mere post hoc rationalization.
FERC has the responsibility of deciding how to achieve its statutory mandate of ensuring just and reasonable rates, and we must trust its judgment that the reciprocity condition adequately incentivizes participation of the non-jurisdictional utilities. We are not “to ask whether [the] decision is the best one possible or even whether it is better than the alternatives,” including the Utilities’ alternative suggestions. F.E.R.C. v. Elec. Power Supply Ass’n, — U.S. -, 136 S.Ct. 760, 782, 193 L.Ed.2d 661 (2016). “[N]owhere is that more true than in a technical area like electricity rate design.” Id.
Thus, FERC does not have to convince us that its approach is sounder than the Utilities’ approach. “The disputed question here involves both technical understanding and policy judgment,” and the record establishes that FERC “engaged in reasoned decisionmaking” by weighing competing views, selecting an approach based on the methods and goals of Order No. 1000, and “intelligibly” articulating “the reason for making that choice.” Id. at 784. This is sufficient. Id. For but one example of FERC’s reasoned decisionmaking, consider Paragraph 31 of the Second Order on Rehearing. There, FERC explained why it would permit the non-jurisdictional utilities to participate in the WestConnect region as Coordinating Transmission Owners *512 without imposing binding cost allocation upon them:
The Commission has accepted Filing Parties’ proposal to plan for non-public utility transmission providers, as coordinating transmission owners, without requiring that those non-public utility transmission providers enroll in the WestConnect transmission planning region and, thus, be subject to binding cost allocation. The Commission explained that doing so “will increase transparency, support the building of a record with respect to transmission planning, and allow regional transmission planning to be conducted inclusive of nonpublic utility transmission providers, so as to expand opportunities for identifying and proposing more efficient or cost-effective regional transmission projects.” Allowing a non-public utility transmission provider to determine, consistent with its statutes, whether to accept the cost allocation may further expand open, transparent planning. By not enrolling, the non-public utility transmission providers are not full members of the WestCon-nect transmission planning region and, therefore, cannot be involuntarily allocated the costs of new transmission facilities that are selected in the regional transmission plan for purposes of cost allocation. While this situation may create the potential for free ridership, as it does when any entity not enrolled in the transmission planning region benefits from a new transmission facility, it is not inconsistent with Order No. 1000.
(Second Opinion on Rehearing at ¶ 31.)
This is precisely the reasoned decision-making to which we must defer. FERC has decided that, even accounting for the Utilities’ free rider objection, other considerations support its determination. The Majority perceives a major concession in this paragraph: that under the Compliance Orders, there may be free riders. Majority Op. at 507-08 n.13. It is no such thing for three reasons. First, as has been already explained, the statement regarding free riders merely shows that, even when considering “the potential for free ridership,” FERC’s policy decision best serves its goals. This conclusion merits our deference.
Second, the statement demonstrates that the sort of free rider problem the Utilities complain of is not unique but rather is the same free rider problem that arises “when any entity not enrolled in the transmission planning region benefits from a new transmission facility.” In other words, this particular free rider problem is indistinguishable from the free rider problem acknowledged in Order No. 1000. (Order No. 1000 ¶ 660, 76 Fed.Reg. at 49,942 (“We acknowledge that this Final Rule’s approach may lead to some beneficiaries of transmission facilities escaping cost responsibility because they are not located in the same transmission planning region as the transmission facility. Nonetheless, the Commission finds this approach to be appropriate.”).
Third, there is simply no support for the conclusion that a “potential for free ridership” is fatal to FERC’s regulatory scheme. See South Carolina, 762 F.3d at 88 (“[Njothing requires the Commission to ensure full or perfect cost causation”). All plans have drawbacks. FERC’s “balancing of the competing goals” and incremental approach to reform demand our deference. Id.
At bottom, the Majority errs by treating the required “satisfactory explanation” as one that actually persuades the court as to the wisdom of FERC’s decision or that actually rebuts the Utilities’ speculative contentions regarding unintended consequences. *513 [1] Across three compliance orders, FERC has “addressed th[is] issue seriously and carefully, providing reasons in support of its position and responding to the principal alternative advanced.” Electric Power Supply Association, 136 S.Ct. at 784. We must defer.

. See Majority Op. at 505,("FERC’s Compliance Orders nowhere provide a reasoned explanation for why the non-jurisdictional utilities have incentive or obligation to participate in binding cost allocation when they can get many of the same benefits at the jurisdictional utilities’ expense.... FERC does not explain how it can meet its obligation to ensure just and reasonable rates by effectively assuring that many of the costs of new development will be imposed on only half of the utilities in the WestConnect region.... Absent a more reasoned explanation for why the non-jurisdictional utilities will participate in the binding cost allocation process, or why their lack of participation will not result in unjust and unreasonable rates, we conclude that the Compliance Orders are arbitrary and capricious and cannot be approved in their current form.”).